Appellant, LaVonne D. Ritchey, is appealing the judgment of the Lake County Court of Common Pleas granting judgment in favor of appellee, Pinnacle Environmental Group, Inc., in the amount of $16,151.67, and an order of foreclosure of its mechanic's lien filed against appellant's property, in the amount of $15,758.07.
Appellant was the owner of a gas station in Mentor, Ohio. She contracted with appellee, an environmental consulting firm, to remove five underground petroleum storage tanks from her property. Removal of such tanks is governed by comprehensive statutory requirements and regulations, spelled out in R.C.3737.87, et seq. and O. A. C. 1301:7-9-12 and 1301:7-9-13. A special bureau, the Bureau of Underground Storage Tank Removal ("BUSTR"), oversees compliance with these requirements. Provided for in this legislation is a fund in which the owner of property that contains underground tanks may register to make them eligible for the Ohio Petroleum Underground Storage Tank Release Compensation Board ("PUSTRCB") fund. The fund covered up to $1,000,000, with a $10,000 deductible, in costs associated with cleaning up contamination from underground storage tanks. Not covered was the cost of removal of the tanks.
The contract between the parties was based on a proposal by appellee, approved by appellant, to remove appellant's tanks for an estimated cost of $8,175. The contract further stated that the final cost should be within ten percent of the estimated $8,175. Appellee based its estimate on the assumption that no major release or leak had occurred. The contract listed sixteen specific tasks required to meet state and federal regulations regarding the removal of the tanks. Appellee referred to these tasks as the "scope of work." The tasks included:
1. Acquiring all necessary permits;
 2. Disconnecting all electrical connectors to the pump, dispensers, etc.;
 3. Excavating and removing all dispensers, dispenser islands, and piping material, as required by law;
4. Removing the pavement over the tanks;
 5. Removing the pavement and soil necessary to expose the tops of the tanks;
 6. Reducing the explosivity of the tanks using water and dry ice;
 7. Further excavating the tanks and completing their removal;
 8. Cutting open each tank, steam cleaning the insides, and disposing of the excess sludge;
9. Properly disposing of the tanks;
 10. Screening all soils removed from the tank cavities for contaminants;
 11. Staging all soil believed to be contaminated on visqueen (a type of plastic) and berming it with straw to prevent storm water run-off;
 12. Sampling the soil in the tank cavities and having it analyzed by a qualified laboratory;
 13. Taking a composite sample of all soil suspected to be contaminated to characterize it for proper handling;
14. Loading and hauling all contaminated soil;
 15. Backfilling the tank cavities as deemed appropriate by BUSTR; and,
 16. Generating a closure report meeting the requirements of BUSTR.
The "scope of work" did not include additional work required in the event contamination or free product were found. Appellee took specific exception, in the contract, to three items which were required to comply with the state's regulations and were part of the scope of work recited, but not included as part of its estimate. These items were: (1) the cost for the disposal of liquids and residues from the tanks; (2) the cost for the treatment or disposal of contaminated soils from the tank cavities; and (3) the cost to backfill the tank cavities. Appellee did not include these items because it could not determine, in advance, the amount of work required to complete these tasks. Once the amount of work was known, appellee was to notify appellant of the costs and discuss options with her.
According to the contract, BUSTR would have to be notified within twenty-four hours in the event of the discovery of a leak; procedures would then have to be formulated to comply with various BUSTR requirements. The contract did not specify that it was appellee's duty to complete tasks relevant to notifying BUSTR or to clean up spills. Under the statute and regulations, the ultimate responsibility for any problem rests with the owner of the property, not the contractor working on the site.
Appellee began work at the site, on April 19, 1993. On April 20, during the removal of one of the tanks, appellee discovered two holes, of about one-half inch diameter, in the tank and some contamination around the tank. It also found some contamination around one of the other tanks, but no holes. At this time, a Mentor fire inspector who was present at the site pursuant to statutory requirements ordered appellee to remove the liquid from the two cavities in the ground left by the removal of the tanks. Appellee used a vacuum truck to gather the liquid and transport it to a proper facility to dispose of it. They also notified BUSTR of the leak and possible contamination, pursuant to the fire inspector's orders. Some evidence exists that either appellant or her son was on the site during the excavation, including a videotape of the construction submitted into evidence by appellant. However, nothing in the record indicates that they were notified of the leak or the possibility of extra charges.
Pursuant to the tenth and eleventh items in the proposed scope of work of the contract, appellee screened the soil removed from the cavities, determined it was contaminated, placed it in a pile on visqueen plastic, and bermed it with straw. Appellee hired another contractor to backfill the tank cavities. Appellant paid this contractor in full. Appellee completed removal of the tanks by April 23 and vacated the site, leaving behind a large pile of soil, which it believed to be contaminated.
Sometime between April 20 and May 21, the parties terminated their business relationship. The parties dispute how and when this occurred. Appellee contacted appellant to complain that it was losing money on the job and demanded payment in excess of the contract price. Appellant paid appellee a total of $8,650 and contacted her attorney. Her attorney contacted appellee to question the amount billed and inquire about its plans to dispose of the soil pile. Appellee returned to the site once, to take a soil sample, but never disposed of the soil or completed backfilling the cavities left by the tanks. Although not required to do so, appellee filed reports dealing with the contamination with BUSTR and the state fire marshall. Appellant was forced to hire another firm to dispose of the pile. Upon completion of the project, appellant submitted her costs, some from appellee and some from other firms, to PUSTRCB and was reimbursed $10,941.69 of her expenditures. It is unclear from the trial testimony and invoices which reimbursed charges were for work done by appellee.
Appellee submitted the following seven invoices to appellant, totaling $24,408.07:
 Invoice #1, for $1,674.65, covered work done in preparation for excavation of the tanks, including such things as drafting of plans, meals, and travel;
 Invoice #2, for $14,163.04, covered "a substantial amount of work that was done for the removal of the underground storage tanks," according to the testimony of appellee's project administrator, Glen Alan Taylor. This invoice contains supporting documentation for costs of lodging, travel, and meals (including a charge for a filet mignon);
 Invoice #3, for $1,528.24, included administrative work and work done with respect to the removal of the tanks. Included in this invoice were costs for meetings, meals, and travel. Visqueen, film, and screen, items specifically provided for in the contract, were also included in this invoice. A charge of $840.00 for backfill placement, an item that may be specifically excepted from the contract appears on this invoice;
 Invoice #4, for $1,845.30, included costs for return of rental equipment, travel, mileage, and analytical work on some liquids. These costs were mostly related to equipment used to remove the tanks;
 Invoice #5, for $1,618.70, reflects, according to Mr. Taylor's testimony, work done by appellee's engineer to complete a corrective action report for BUSTR;
 Invoice #6, for $2,826.89, covered costs involved in disposal of liquid waste. Attached to this invoice are bills, dated April 19 and 20, 1993, from Research Oil Co. to appellee. These bills are signed by either appellant or her son; and,
 Invoice #7, for $1,144.85, covered administrative and mileage costs associated with the generation of a closure report.
After not being paid the full amount demanded, appellee filed a mechanic's lien on appellant's property, and filed this suit to foreclose on the lien and to collect damages from appellant. Appellant filed a counterclaim for breach of contract, negligence, intentional misrepresentation, and negligent misrepresentation.
In entering its judgment for appellee, the trial court interpreted the contract as containing a contingency clause in the event contaminants were found. It ruled that since contaminants were found, it was proper for appellee to do the extra work and charge appellant $24,408.07, without notifying appellant, rather than a price in the range of $8,175 to $8,992.50, as agreed to, in the event no leaks or contaminants were found. The court also ordered that appellee file an updated judicial report providing the various interests and priorities in the property, and an appropriate judgment entry setting forth the rights of all parties, within thirty days.
Although not a final appealable order, because the entry did not dispose of appellant's counterclaim, appellant immediately appealed from this judgment entry. After appellant filed this appeal, the trial court issued another judgment entry, which was similar to its previous one except for some added language which included the dismissal of appellant's counterclaim with prejudice. We will proceed to address the merits of appellant's appeal as being prematurely filed.
Appellant raises the following two assignments of error for our review:
 "[1.] The trial court erred in failing to enforce the express written contract of the parties.
 "[2.] The trial court erred in finding that plaintiff was owed $16,151.67."
In appellant's first assignment of error, she argues that the court erred by not enforcing the express contract entered into by the parties. Her argument seems to suggest that the court erred, as a matter of law, in its interpretation of the contract, by allowing appellee to collect more than the $8,175 amount agreed to in the contract. Appellee responds that the trial court properly interpreted the contract because the contract price was for $8,175 only if no contamination was found, but that since contamination was found, appellee was required to do extra work, for which it should have been compensated.
If a contract is clear and unambiguous, then its interpretation is a matter of law. Inland Refuse Transfer Co.v. Browning-Ferris Industries of Ohio, Inc. (1984), 15 Ohio St.3d 321,322; 474 N.E.2d 271. Unlike determinations of fact, which are given great deference, questions of law are reviewed by a court de novo. Ohio Bell Tel. Co. v. Pub. Utilities Comm.
(1992), 64 Ohio St.3d 145, 147; 593 N.E.2d 286. When reviewing a trial court's interpretation of a clear and unambiguous contract, a court of appeals must review the decision de novo.Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm (1995),73 Ohio St.3d 107, 108; 652 N.E.2d 684. We, therefore, review the trial court's interpretation of the appellee's proposal denovo.
Although the proposal addresses different contingencies and talks of uncertainties in the cost of disposal of certain items, the words of the contract are clear and unambiguous. Appellee spelled out, in detail, sixteen separate tasks necessary to remove the underground storage tanks. Of these tasks, it explicitly set forth three tasks that were not included in the estimate and how they would be addressed when appellee could better estimate the amount of work involved. In reading the contract, one could only come to the conclusion that, if there were no leaks or contamination, appellee would complete everything except the specifically excluded items for an amount within 10% of $8,175.
The trial court incorrectly interpreted appellee's assumption, that no leaks or contamination were present, as a contingency clause which provided that additional work necessitated by the discovery of contaminants or free product would be completed by appellee for an extra charge. Such an interpretation allowed appellee to do whatever tasks it deemed necessary at whatever price it set, in the event it found a spill. Such an interpretation is not supported by the language of the contract. The contract does not specify either parties' rights and duties in the event of a spill. Contamination and leaks were addressed, in the contract, by the following paragraphs:
 "[* * *]The Scope of Work does not include work to be done if contamination is evident or free product is discovered in the tank cavity or soils removed from the tank cavity. If contamination is found, as defined by state regulations, then BUSTR must be notified within twenty-four (24) hours.
 "Once BUSTR is notified of a release, Closure Assessment procedures should be completed, followed by a BUSTR-specified Site Check. Depending on the findings of the Site Check, there may be a need for additional investigation and clean-up actions, including a complete Site Assessment, formulation of a Remedial Action Plan and, after approval of the plan, implementation of the remediation work. The Site Check is due within sixty (60) days of the report of a suspected or confirmed release to BUSTR.
 "Again, Pinnacle mentions these additional investigations and reports to let you know of possible required further actions, not because we necessarily believe such work will be required. All of the assessment work, as well as the reports, planning and implementation of any clean-up work is covered by the PUSTRCB fund." [Emphasis added]
Nothing in this language specifies that appellee would do anything without approval in the event of a spill. Read in conjunction with the overall contract, the purpose of this section is to inform appellant of additional mandates, in the event of a spill, which were not included in the contract price.
While the contract declares that BUSTR "must be notified" within twenty-four hours, it is appellant's ultimate responsibility, under the relevant statutes, to make sure that BUSTR is notified. While the contract also points out that "Closure Assessment procedures should be completed" and that "there may be a need for additional investigation and clean-up actions," it is not clear that appellee would be doing these things. Even if it were implied that appellee would do these tasks, it cannot be implied that appellee could do these tasks without approval and for whatever price it decided to charge. Therefore, appellant's first assignment of error has merit.
In appellant's second assignment of error, she argues that the trial court erred by awarding appellee $16,151.67. She seems to be arguing that since plaintiff had not sufficiently proven its damages, such an award was against the manifest weight of the evidence. Appellee responds that the evidence was sufficient.
"Judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr. Co.
(1978), 54 Ohio St.2d 279, 280; 376 N.E.2d 578. In the instant case, there is scant evidence supporting appellee's claim for extra compensation under the contract. Even had the trial court correctly interpreted the contract, most of the work for which appellee charged was work that was clearly within the scope of the contract and not done as a result of the leak and the contamination. The consideration to be paid for the items covered under the scope of work of the contract was to be within 10% of $8,175, not appellee's costs for completing those items.
The evidence clearly established that appellee completed all of the work necessary to complete the removal of the five underground storage tanks and all closure reporting properly, as proposed by the contract. Of the items specifically excepted from the contract:
 (1) Appellee incurred costs for the disposal of liquids and residues from the storage tanks, which were approved by appellant when signing receipts for the disposal;
 (2) Appellee left the pile of soil excavated from the tank cavities and did not incur costs for the treatment or disposal of contaminated soil; and,
 (3) Appellee hired another contractor to backfill the tank cavities. This contractor was paid directly by appellant; therefore, appellee incurred no costs of its own to backfill the tank cavities.
Other than liquid disposal charges, it appears that the rest of the items from the invoices should have been included within the estimated contract price, since no other charges were authorized by appellant or clearly identified. According to the testimony of Glen Alan Taylor, appellee's project administrator, appellee submitted one estimate for $14,163.04, which covered "a substantial amount of work that was done for the removal of the underground storage tanks." Removal of the underground storage tanks was what the estimate of $8,175 covered and was not extra work contemplated by the contract. Mr. Taylor further testified that, when making the $8,175 estimate, he considered the cost of analytical testing of soil pulled from the tank cavities, the cost for rental equipment, lodging and food for employees, and the 15% mark-up used by appellee. While all these costs were figured into the estimate, appellee still included them on the invoices, which came to a total nearly three times the amount of the estimate.
Michael Glaze, appellee's president, also testified that he was unaware whether he, or any of his employees, ever informed appellant that they were doing work outside the scope of the contract. The extent of the extra work done as a result of the leak, supported by appellee's testimony, appears to be: the generation of a corrective action report, which was never proven to be necessary or approved by appellant; the disposal of contaminated liquids, which is recoverable; and, the generation of a closure report, which was required under the original price estimate.
Based on a review of the record and arguments made by counsel during oral arguments, it is clear that appellee did some extra work as a result of the leak. For example, $2,826.89 appears as the charge for liquid disposal, which was clearly considered extra work, according to the contract. Beyond the liquid disposal charge, the evidence presented in the record fails to support the trial court's award of $16,151.67. Appellant's second assignment of error has merit.
We reverse the judgment of the trial court and remand for a new trial. The parties may only contest this matter on a contractual theory, and may not raise quantum meruit, implied contract, or estoppel, since they were not raised at the original trial.
 --------------------- JUDGE ROBERT A. NADER
FORD, P.J., O'NEILL, J., concur.